**Felix WAISOME, et al., Plaintiffs,**

v.

**PORT AUTHORITY OF NEW YORK AND NEW JERSEY and the Port Authority Police Benevolent Association, Inc., Defendants.**

**No. 88 Civ. 1234 (KTD).**

United States District Court,
S.D. New York.

Jan. 29, 1991.

LDF—NAACP Legal Defense and Educational Fund, Inc., New York City (Julius

LeVonne Chambers, Ronald L. Ellis, Eric Schnapper, of counsel), for plaintiffs.

The Port Authority of New York and New Jersey, New York City (Milton H. Pachter, of counsel), for defendants.

## MEMORANDUM & ORDER

KEVIN THOMAS DUFFY, District Judge:

Plaintiff Felix Waisome, *et al.* commenced this action for injunctive and declaratory relief against defendants Port Authority of New York and New Jersey ("Port Authority") and the Port Authority Police Benevolent Association, Inc. ("PBA"), claiming violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d, 2000e, *et seq.*, as well as the Civil Rights Act of 1866, 42 U.S.C. §§ 1981, 1983. Specifically, Waisome seeks relief based on allegedly unlawful selection criteria employed by the Port Authority for police promotions to the rank of Sergeant which had an adverse impact on himself and other like Black applicants. On February 24, 1988, two days after the complaint in this action was filed, Waisome moved for a preliminary injunction to enjoin the Port Authority's continuation to select candidates from a promotion list developed based on the disputed selection criteria. On October 14, 1988, I denied the motion for a preliminary injunction because a showing of irreparable injury was lacking. Waisome now moves pursuant to Fed.R. Civ.P. 23 for an order certifying this proceeding as a class action.[1] Waisome, apparently inadvertently failed to raise the class certification issue at the preliminary injunction stage and seeks to correct the omission now. In addition, Waisome moves pursuant to Fed.R.Civ.P. 56 for partial summary judgment on the issue of Port Authority's liability. The Port Authority, in turn, cross-moves for summary judgment dismissing the complaint. Further, Port Authority asks that the merits of the claims be addressed before the class is certified.

---

1. The P.B.A. takes no position on whether to certify the plaintiffs as a class. *See* P.B.A. Response to Application of Class Certification ¶ 2. Port Authority contests the certification.

## STATEMENT OF FACTS

On July 11, 1986, the Personnel Department of the Port Authority announced the commencement of an examination process for the purpose of establishing a list of Port Authority police officers eligible for promotion to the rank of Sergeant. Plaintiff's 3(g) Statement ("Plaintiff's 3(g)") ¶ 4.[2] In order to be eligible to participate, candidates for promotion were required to have at least two years in grade (including Academy training) as a Port Authority police officer. Each candidate was required to be actually working as a police officer as of the first date of the written test. Defendant's Cross–Motion, Exh. 1.

The selection process for placement on the "Eligible List" consisted of three basic components. The first consisted of a written test in order to "measure knowledge of the law, police supervision and social and psychological problems in police work." The second component was an oral test to "measure judgment and personal qualifications." The third component was a performance appraisal consisting of two parts—a supervisory performance rating and a score based on the candidate's attendance record. Plaintiff's 3(g) ¶¶ 6, 7.

The written examination for police officers was administered on September 6, 1986 and a make-up test was administered for the written exam on September 20, 1986. Plaintiff's 3(g) ¶ 9. In mid-November, 1986, candidates were notified regarding their scores on the written component and given until December 19, 1986, to appeal the results. By January 8, 1987, all the appeals taken were completed. Plaintiff's 3(g) ¶ 9. The individual oral examinations were administered between January 26, 1987 and February 13, 1987. The performance appraisal process began on March 2, 1987 and was completed by March 20, 1987. Plaintiff's 3(g) ¶ 11. Performance appraisal ratings were factored into the total test score and the three-year eligibility list was issued on March 30, 1987. Plaintiff's 3(g) ¶ 11.

The passing score for the written examination was 66% and the passing score for the oral was 69.9%. Plaintiff's 3(g) ¶ 8. A passing score on the written was a prerequisite to proceed to the oral examination. In turn, a passing score on the oral was required to proceed to the performance appraisal. Plaintiff's 3(g) ¶ 8. The weights accorded to the three components of the selection process were 55% for the written examination, 35% for the oral examination and 10% for the performance appraisal process. Plaintiff's 3(g) ¶ 7.

A total of 617 police officers (including detectives) participated in the selection process. Of these officers, 508 were White and 64 were Black. Plaintiff's 3(g) ¶ 14. A total of 539 participants passed the written examination. Of those who passed the written exam, 455 were White and 50 were Black. Plaintiff's 3(g) ¶ 14.

Of the 539 successful candidates on the written examination, 531 participants took the oral examination. Of those who either decided not to or could not proceed further, 7 were White and 1 was Black. Plaintiff's 3(g) ¶ 21. Of the 531 participants who took the oral examination, 448 were White and 49 were Black. Plaintiff's 3(g) ¶ 23. Of the 531 participants, 310 passed the oral exam. Of those who passed, 258 were White and 33 were Black. Plaintiff's 3(g) ¶ 22. On the oral examination, the Black pass rate was 67.35%. This rate was 116.97% of the White pass rate of 57.58%. Plaintiff's 3(g) ¶ 22. Of the White candidates who participated in both the written and the oral examination, 51.70% passed (258 divided by 499) and of those Black candidates who participated in both oral and written examinations, 51.56% (33 divided by 64) passed. Defendant's 3(g) ¶ 5.

The eligibility list expired on March 30, 1990; 79 promotions had been made from the list and the 85th candidate on the list had been reached. The promoted officers who participated in the entire testing process included 70 Whites, 5 Blacks and 2 others. Plaintiff's 3(g) at 10–11. Two indi-

---

**2.** Plaintiff's Statement pursuant to the Southern District of New York local Rule 3(g) states facts which accord with Port Authority's rendition of the facts. To that extent, the facts as stated are not substantially disputed.

viduals who were "grandfathered" onto the list also accepted promotions, both were White.

## DISCUSSION

### A. Certification as a Class

The prerequisites to a class action, in the conjunctive are:

(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a)(1–4) (1990).

This case presents a situation in which class certification is consistent with Fed.R. Civ.P. 23. The underlying claim concerns the legality, under Title VII, of a promotional examination given in 1986–1987, the results of which were to be used to make all promotions to the position of Sergeant for a three-year period from 1987 through 1990. The proposed class, consisting of the Black officers who took that examination, totals more than sixty, which is large enough to make joinder impracticable. Whether or not the test is unlawful under Title VII, the central question in this case, is a question common to the claims of all the putative class members including the named plaintiffs. Although some of the plaintiffs have slightly different bases for their claims against the Port Authority and P.B.A., the facts and claims adduced represent common questions of law and fact. These questions turn on the allegedly disparate impact of the Port Authority's testing procedures on minority promotion opportunities. The denial of preliminary injunctive relief does not alter the fact that the Port Authority's use of the exam is clearly action taken "on grounds generally applicable by the class" and that if successful, the class may be entitled to "final injunctive relief." Fed.R.Civ.P. 23(b)(2).

The Port Authority maintains that certification of the plaintiffs as a class is unnecessary if the Court determines that the action is not meritorious, granting summary judgment in defendants' favor. I disagree. "In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178, 94 S.Ct. 2140, 2153, 40 L.Ed.2d 732 (1974) (quoting *Miller v. Mackey International*, 452 F.2d 424, 427 (5th Cir.1971)). Because the "Court [must] determine whether a suit denominated a class action may be maintained as such '[a]s soon as practicable after the commencement of [the] action....,'" the constraints of Fed.R.Civ.P. 23 do not permit handling the merits of claim prior to certification. *Id.*

Moreover, class certification in this instance will advance the just and efficient disposition of the underlying claims. If the class is certified and Waisome prevails on the merits, all remedial issues may be resolved in a single proceeding. Thus, with class certification, all non-named Black test takers could be collaterally estopped from bringing individual claims at some later date. On the other hand, if the Port Authority prevails and the class were not certified, then all class members except the named plaintiffs would be free to file individual lawsuits challenging the legality of the disputed examination process. It would further appear that the plaintiffs are truly representative of the class and that plaintiffs' counsel will render appropriate representation to the class members. Thus, the plaintiffs in this action are hereby certified to proceed as a class.

### B. Disparate Impact of Examination Process

The parties agree that the only issue to resolve on the merits is whether the examination process under challenge had adversely impacted Black candidates.[3]

**3.** Port Authority thereby agrees that if I find

that the examination had an adverse impact on

Section 703(a)(2) of Title VII, in pertinent part, states:

It shall be an unlawful employment practice for an employer—(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

78 Stat. 255, as amended, 42 U.S.C. § 2000e–2(a)(2) (1982).

■ "Title VII proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation." *Connecticut v. Teal*, 457 U.S. 440, 446, 102 S.Ct. 2525, 2530, 73 L.Ed.2d 130 (1982) (quoting *Griggs v. Duke Power Co.*, 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971)). "Relying on § 703(a)(2), *Griggs* explicitly focused upon employment 'practices and procedures,' or tests that deny equal employment opportunity." *Connecticut v. Teal*, 457 U.S. at 448, 102 S.Ct. at 2531 (citing *Griggs v. Duke Power Co.*, 401 U.S. at 431, 91 S.Ct. at 853). Title VII clearly prohibits procedures or testing mechanisms that operate as "headwinds" for minority promotions. The *Griggs* Court stated that: "[w]e found that Congress' primary purpose was the prophylactic one of achieving equality of employment 'opportunities' and removing 'barriers' to such equality. 401 U.S. at 429–30, 91 S.Ct. at 852; *see New York City Transit Authority v. Beazer*, 440 U.S. 568, 584, 99 S.Ct. 1355, 1365, 59 L.Ed.2d 587 (1979) (prima facie violations of Title VII may be established by statistical data reflecting employment practices which creates the essential effect of denying members of one race equal access to employment or promotion opportunities.)

■ In order to determine whether a component of a selection process had an adverse effect, the issue is whether the disputed component denied minorities, to a disproportionate degree, the opportunity to be promoted.

A disparate-impact claim reflects the language of § 703(a)(2) and Congress' basic objectives in enacting that statute, to achieve equality of employment *opportunities* and remove barriers.... In other words, § 703(a)(2) prohibits "... unnecessary barriers to deprive any individual of employment *opportunities*"... Congress' primary purpose was achieving equality of "opportunities" and removing "barriers to such equality...." Title VII guarantees these individual plaintiffs the *opportunity* to compete equally with white workers on the basis of job-related criteria.

*Connecticut v. Teal*, 457 U.S. at 448–51, 102 S.Ct. at 2531–33 (emphasis in original).

■ The case law in the disparate impact arena focuses on evidence of statistical disparity, and a determination of which of the competing explanations for the aberration abide. *Watson v. Ft. Worth Bank & Trust*, 487 U.S. 977, 987, 108 S.Ct. 2777, 2784, 101 L.Ed.2d 827 (1988). Standard deviation analysis is a unit of measurement to assess whether differences in selection rates are statistically significant.[4] In this case, the written component of the examination was taken by 508 Whites and 64

Blacks, it will not seek to litigate the validity of the examination.

**4.** The Second Circuit defines the concept of standard deviation as follows:

The standard deviation for a particular set of data provides a measure of how much the particular results of that data differ from the expected results. In essence, the standard deviation is a measure of the average variance of the same, that is, the amount by which each item differs from the mean. The number of standard deviation by which the actual results differ from the expected results can be compared to the normal distribution [or bell] curve, yielding the likelihood that this difference would have been the result of chance. The likelihood that the actual results will fall more than one standard deviation beyond the expected results is about 32%. For more than two standard deviations, it is about 4.6% and for more than three standard deviations, it is about .03%. On this basis, the Supreme Court concluded [ ] that when actual results fell more than three standard deviations from the expected result (that is, a race-neutral selection), the deviation could be regarded as caused by some factor other than chance.

Blacks. Of those, 455 Whites and 50 Blacks passed the written examination. Thus, the percentage of Whites passing was 89.57% and the percentage of Blacks passing was 78.13%. The Port Authority does not deny that the difference is statistically significant; the statistical measure of this disparity is 2.68 standard deviations. *See* Abrams Affid.; Shapiro Statement. "The greater the number of standard deviations, the less likely it is that chance is the cause of any difference between the expected and observed results." *Ottaviani v. State Univ. at New Paltz*, 875 F.2d 365, 371 (2d Cir.1989). A standard deviation of 2.68 means that the chance of such a difference in pass rates occurring by chance is less than 1 in 100.

The Second Circuit, however, rejected the efficacy of a "minimum threshold level of statistical significance" for determining whether the plaintiff has established a prima facie case of discrimination. *Ottaviani v. State Univ. at New Paltz*, 875 F.2d at 373. Citing *Watson v. Ft. Worth*, the *Ottaviani* Court noted that "recent Supreme Court pronouncements instruct that there simply is no minimum threshold level of statistical significance which mandates a finding that Title VII plaintiffs have made out a prima facie case." *Id.* Thus, although a finding of two standard deviations evince significant criteria upon which to base a prima facie case of discrimination, standard deviation analysis is not the only endorsed approach under Title VII.

> It is certainly true that a finding of two to three standard deviations can be highly probative of discriminatory treatment. As tempting as it might be to announce a black letter rule of law, however, recent Supreme Court pronouncements instruct that there simply is no minimum threshold level of statistical significance which mandates a finding that Title VII plaintiffs have made out a prima facie case. *See e.g., Watson v. Ft. Worth Bank & Trust*, 487 U.S. 977, 987 [108 S.Ct. 2777, 2784, 101 L.Ed.2d 827] (1988).

*Ottaviani v. State Univ. at New Paltz*, 875 F.2d at 372–73.

█ A test for statistical significance measured by the standard deviation for a particular set of data is insufficient, standing alone, to measure the legal significance or practical impact of any disparities in the selection process in this case. When a case of disparate impact rises or falls on a comparison of the numbers selected, the point at which there is a disparity in selection rates between the races must grow so large that it may be said that the numbers alone establish a "sufficiently substantial" difference in selection rates to warrant an inference of discriminatory impact. "Statistical significance is not the same as practical significance because in isolation it tells nothing about the importance or magnitude of the differences." *Bilingual Bicultural Coalition on Mass Media, Inc. v. FCC*, 595 F.2d 621, 642 n. 57 (D.C.Cir.1978) (quoting H. Blalock, *Social Statistics* at 163 (2d Ed.1972)). In order to determine the importance or magnitude of the differences, the statistical data must be analyzed in the context of the situation in practical terms.

Guidelines exist for determining practical significance. For example, the Supreme Court has stated a "four fifths rule" or "80% rule" which provides in pertinent part:

> A selection rate for any race, sex, or ethnic group which is less than four-fifths (⅘) (or eighty percent) of the rate for the group with the highest rate will generally be regarded by the Federal enforcement agencies as evidence of adverse impact, while a greater than four-fifths rate will generally not be regarded by Federal enforcement agencies as evidence of adverse impact. Smaller differences in selection rate may nevertheless constitute adverse impact, where they are significant in both statistical and practical terms or where a user's actions have discouraged applicants disproportionately on grounds of race, sex, or ethnic group. Greater differences in selection rate may not constitute adverse impact where the differences are based on small numbers and are not statistically significant, or where special recruiting or other programs cause the pool of minority or female candidates to be atypical of

the normal pool of applicants from that group. 29 C.F.R. § 1607.4D (1988).

■■■ Both the 80% rule and standard deviation analysis is acceptable for determining the impact of a selection process which is alleged to have a discriminatory effect. *See e.g., Guardians Assoc. of New York City Police Dept., Inc. v. Civil Service Com'n,* 630 F.2d 79, 88 (2d Cir.1980). Moreover, although the difference in selection rates between two groups may be statistically significant, the differential may not prove practically significant. In this case, the written component of the examination was taken by 508 Whites and 64 Blacks. Of those, 455 Whites and 50 blacks passed the written examination based on a passing score of 66. The percentage of Whites passing was 89.57% and the percentage of Blacks passing was 78.13%. Thus, the passing rate for Blacks was 87.2% of the passing rate for Whites, a rate which exceeds the 80% rule constraints. *Compare Bushey v. New York State Civil Service Comm,* 733 F.2d 220, 225–26 (passing rate for promotion to Correction Captain was fifty percent lower for minority candidates than for non-minorities) *aff'd without op.* 767 F.2d 907 (2d Cir.1985); *Kirkland v. New York State Dept. of Correctional Services,* 374 F.Supp. 1361 (S.D.N.Y.1974), *aff'd,* 520 F.2d 420, 425 (2d Cir.1975), *cert. denied,* 429 U.S. 823, 97 S.Ct. 73, 50 L.Ed.2d 84 (1976) (30.8% of the Whites passed exam while only 7.7% of the Blacks passed the exam for promotion to Correction Sergeant.)

Furthermore, in this case, the test for statistical significance yielded a standard deviation of 2.68. However, this was of purely mathematical and statistical significance because, in practical terms, had two more Black candidates had passed the examination, the difference in pass rates would no longer be statistically significant. A proper analysis of a written examination with results which are as close as these requires consideration of not only bare statistical significance, but also practical significance. *See Bicultural Coalition on Mass Media, Inc. v. FCC,* 595 F.2d at 642 n. 57) (statistics alone contributes nothing of importance in terms of the magnitude of the differences.)

That Waisome argues the real minimum score is not 66, as the Port Authority contends, but 76, because anything lower than a score of 74 eliminated the candidate from meaningfully competing for a promotion is not as significant on second glance. Specifically, Waisome contends that "from a purely mathematical perspective, a score of at least 76 was needed for an applicant to be eligible for promotion" and a test for statistical significance between the proportion of Blacks scoring 76 or above yields a difference of 2.68 standard deviations, showing adverse impact.

■■■ While some Blacks performed comparatively well on the written component, Blacks as a group scored lower than Whites. This, Waisome argues, indicates adverse impact of the test as a whole because it demonstrates that any one part of the selection process had an adverse impact. In *Connecticut v. Teal,* however, the Supreme Court explained that a pass/fail barrier which excludes candidates from further participation in the process should be separately analyzed. By separating the components at bar, it is revealed that several of the Black candidates passed the written portion of the examination, only to go on to fail the orals. There was no statistical significance attributed to the rate at which Black candidates failed here. Indeed, Waisome's analysis, concentrating on the effective score needed on the written exam, is short sighted and does not take into consideration a basic fact, namely, that when the number of Blacks who achieved passing scores is compared to the number of Whites who achieved passing scores, no statistical disparity in selection rates is revealed.

When the examination process under challenge here is scrutinized with an eye towards practical as well as statistical significance, there are insufficient disparities between the Black and White selection rate to base a finding of discriminatory impact at this juncture.

**178**

Finally, Waisome argues that the Port Authority's eligibility list for promotion unfairly ranks successful minority candidates on a lower plane on the vertical promotion list. However, only a small number of promotions are made at any given point. Waisome bases his claims on a promotion rate in which only 5 Blacks and 70 Whites were selected. Where differences are based on smaller numbers, the proper approach is to perform a statistical analysis of the disparity in selection rates. Applying standard deviation analysis to measure the impact of the written test, the difference in selection rates is 1.34 standard deviations. This is well below the level of 2 or 3 standard deviations, constituting statistical significance. *See Kirkland v. New York State Dept. of Correctional Services,* 711 F.2d 1117, 1131 (2d Cir.1983) (citing *Castaneda v. Partida,* 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977)) (a standard deviation of greater than 2 or 3 constitutes evidence of disparate impact, for such a great deviation could "only be regarded as caused by some factor other than chance.")

In sum, when pass rates are analyzed, neither the written nor oral examination component had an adverse impact on Black candidates. Further, when the same standard deviation analysis measuring the impact of the written examination is applied to the actual promotions made from the eligibility list, no significant adverse impact is demonstrated.

 For the foregoing reasons, Waisome *et al.* have failed to show a sufficiently substantial difference in White and Black selection rates or performance rates which would raise an inference of discriminatory impact. It would appear that there is nothing other than the statistical basis for the complaint. Thus, summary judgment is granted in favor of the Port Authority and P.B.A. The complaint is hereby dismissed in its entirety.

SO ORDERED.