John J. HOGAN and David J. Rees, Each Individually, and on Behalf of all Other Persons Similarly Situated, Plaintiffs,

v.

GENERAL ELECTRIC COMPANY; Stephen D. Hollenberg, Individually, and as an employee of General Electric Company; and Ronald R. Pressman, Individually, and as an Employee of General Electric Company, Defendants.

No. 1:97-CV-135.

United States District Court, N.D. New York.

Aug. 11, 2000.

Berger, & DuCharme, LLP, Clifton Park, NY, John B. DuCharme, of counsel, for plaintiffs.

Nixon Peabody, LLP, Rochester, NY, Margaret A. Clemens, of counsel, for defendants.

## MEMORANDUM DECISION AND ORDER

HURD, District Judge.

## I. *INTRODUCTION*

Plaintiffs, John Hogan ("Hogan") and David Rees ("Rees"), individually, and on behalf of all others similarly situated, commenced the current action alleging age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621–34, and the New York State Human Rights Law ("HRL"), N.Y.Exec.Law § 296(6) (McKinney 1993 & Supp.2000). Carmen Laporta ("Laporta") and William Sheahan ("Sheahan") became "opt-in" plaintiffs after the filing of the initial complaint.

The defendants have moved for summary judgment, pursuant to Fed.R.Civ.P. 56, claiming that the complaint must be dismissed because the plaintiffs cannot, individually or collectively, prove their ADEA claims of disparate impact and disparate treatment discrimination. Defen-

dants also contend that plaintiffs' claim of discrimination under the HRL should be dismissed. In addition, defendants have filed a motion in limine to exclude plaintiffs' statistical report. This motion argues the report is flawed since it uses an improper population and does not take into account other possible causes for the statistical discrepancy. Plaintiffs oppose both motions. Oral argument was heard on June 9, 2000 in Utica, New York. Decision was reserved.

## II. *FACTS*

On July 17, 1995, General Electric Power Systems ("GEPS") conducted an involuntary reduction-in-force ("RIF") at its Schenectady, New York facility. Defendant General Electric Company ("GE") claims the RIF was required because of increased global competition which facilitated a need to reduce costs to remain competitive. The terminations during the RIF took place in the Marketing & Sales Division of GEPS. Among those terminated were the plaintiffs in this action.

At the time of the RIF, there were one-hundred seventy-four (174) workers eligible for termination in the Marketing & Sales Division. Of the 174, ninety-nine (99) were over the age of forty, and seventy-five (75) were under forty. Between nineteen (19) and twenty-two (22) employees were terminated as a result of this RIF.[1] It is undisputed that sixteen (16) of the employees terminated were over the age of forty.

During all relevant times, defendant Ronald Pressman ("Pressman") was Vice President of the Marketing & Sales Division of GEPS, and defendant Stephen Hollenberg ("Hollenberg") was the General Manager of the Global Sales Integration and Support unit, a sub-unit of the Marketing & Sales Division. The RIF was conducted after the offering of a voluntary job elimination package did not produce the needed cost reduction. Managers of the various departments within the Marketing & Sales Division were instructed to select individuals for layoff pursuant to the *GEI & PS Human Resources Procedure, Subject Lay Off.* If an employee's job was "unique" and non-essential to the functioning of GEPS, they were directly laid off. If there was a need to eliminate some employees performing similar jobs, the managers were instructed to use a "layoff determination comparison matrix" to rank employees. (Weyl Aff.Ex. B at 3.) These matrices ranked employees based on five criteria: performance, productivity, criticality of skills, versatility/adaptability, and length of service. According to this system, length of service with GE, a factor strongly correlated with age, benefitted the employee. After the initial termination decisions were made and reviewed by mid-level management, Pressman was required to personally review the termination of any employee with more than twenty years of service at GEPS. According to the defendants, the human resources and legal departments also reviewed the terminations.

Laporta, age fifty-eight at the time of the RIF, was a Specialist of Technical Manuals with twenty-three years of service with GE. He organized the schedule for the creation of the service manuals for GEPS' products. Laporta was originally placed on a matrix with twenty-six (26) other employees where he ranked fifth. However, after a meeting attended by defendant Hollenberg and other GEPS management, Laporta's position was labeled "unique," he was taken off the matrix, and was immediately terminated.

Hogan, who was fifty-four at the time of the RIF, was the Manager for Transaction Methods and Systems with twenty-eight years of service with GE. In this position, Hogan developed various computer programs and integrated new programs into existing apparatus. Hogan claims to have

---

1. The number of individuals terminated during the RIF is heavily disputed by the parties. The defendants claim 22 workers were let go while the plaintiffs claim only 19 were terminated.

worked with three (3) other people, ages twenty-nine, forty, and forty-one. However, his position was labeled "unique," and he was not placed on a matrix for comparison.

Rees, age fifty-eight at the time of the RIF, was a Program Development Manager with twenty-nine years of service with GE. Rees' main responsibility was organizing "State of the Art" conferences and seminars. These conferences were eliminated as part of GEPS' cost-cutting measures. Rees allegedly worked with three (3) other people, ages twenty-six, thirty-one, and forty. Nevertheless, his position was also labeled "unique," and he was not placed on a matrix for comparison.

Sheahan, who was fifty-one at the time of the RIF, was a Sales Manager with twenty-six years of service with GE. In this position, he assisted in the development of power plant projects in Asia. Sheahan worked with four (4) other people, ages thirty-six, thirty-eight, forty-one, and fifty-six. Sheahan was placed on a comparison matrix and placed second out of five (5). While the three (3) lower ranked employees were also "terminated," two quickly found other work within GE. Of the 5, only Sheahan and his fifty-six year old co-worker could not find jobs within GE.

After this suit commenced, plaintiffs hired Dr. Debojyoti Sarkar ("Dr. Sarkar") of Integral Research, Inc. to prepare a statistical report on the RIF to determine if there was any correlation between the age of an employee and termination. This report determined that age was significantly related to termination in the RIF. Dr. Sarkar evaluated the statistics holding education of an employee constant, but he did not test the affect of other possible causes for termination.

### III. DISCUSSION

#### A. Motion to Exclude Expert Report

■ Defendants contend the expert report of Dr. Sarkar should be excluded because it relies on an incorrect population and does not account for other factors which may have caused the statistical discrepancy. Parties cannot "gerrymander" statistical data to skew the results in their favor. *See Fisher v. Vassar College*, 70 F.3d 1420, 1443 (2d Cir.1995). Secondly, a statistical report cannot arrive at a conclusion without accounting for other possible causes. *See, e.g., Hollander v. American Cyanamid Co.*, 172 F.3d 192, 203 (2d Cir. 1999) (ruling a statistical expert must attempt to account for explanations other than discrimination); *Raskin v. Wyatt Co.*, 125 F.3d 55, 67–68 (2d Cir.1997) (holding a failure to account for early retirement plan decreases probative value of statistical report). Statistical evidence that omits the major variables is not probative. *Bickerstaff v. Vassar College*, 196 F.3d 435, 449 (2d Cir.1999).

According to the defendants, Dr. Sarkar intentionally classified the employment status of some workers incorrectly so as to obtain the desired statistical results. However, a plaintiff should not be penalized for relying on information provided by opposing counsel. The answers to interrogatories given by the defendants were often confusing and contradictory. This was confirmed by Magistrate Judge Ralph W. Smith, Jr. in his Memorandum–Decision of March 23, 1999, wherein he states, "the information proved by GE for use by plaintiff's expert was at worst, wrong, and at best, confusing." *See* Docket No. 49.

The controversy regarding the data set revolves around the classification of five (5) employees, two (2) over forty, Richard Schubert and Robert Shaw; and three (3) under forty, Kimberly Mangino, Peter Pritchard and Robert Gentner. The answers to the second set of interrogatories clearly state that four (4) of the five (5) disputed employees were terminated in the RIF. According to this answer, the fifth employee, Robert Gentner, was not involuntarily terminated. (Rees Aff.Ex. N at 14.) Defendant's answers to the third set of interrogatories list Ms. Mangino, Mr.

Pritchard, and Mr. Gentner as "transferred." (Rees Aff.Ex. B. at 5–6.) However, in the same set of answers, these three employees were listed as "involuntarily laid-off." *Id.* Affidavits by the three "transferred" employees stating they were laid-off during the RIF were signed in February of 2000 while the supplemental statistical report was completed on September 1, 1999. Therefore, these affidavits were not available to Dr. Sarkar when he completed his analysis, and he was forced to rely on the answers to the interrogatories.

■ The number of employees terminated during the RIF is a disputed question of fact. The plaintiffs' interpretation of the job status of the employees in question was reasonable in light of the conflicting interrogatory responses, and the report should not be excluded as a matter of law. Therefore, the credibility given to the statistical report should be determined at trial.

While the law requires a statistical expert to control for other possible causes for a statistical discrepancy, the information needed to conduct the proper regression is completely controlled by GE. Defendants allege that performance, productivity/contribution, adaptability/versatility, criticality of skills, and length of company service were used to evaluate which employees would be retained and which would be terminated, and that the plaintiffs' expert should have controlled for these variables. Nevertheless, his ability to include these factors was precluded by the defendants. Since not all the past performance evaluations were turned over during discovery, it was impossible for the plaintiffs' expert to perform the required analysis.[2] The defendants did turn over the results of the matrix comparisons during discovery. However, these results are not sufficient

to conduct the required analysis as they do not rank any employees considered "unique," and they could easily be manipulated to achieve predetermined lay-offs. Evaluations of the employees prior to the RIF should have been turned over to Dr. Sarkar, or if these items truly do not exist, the plaintiffs' expert could not be expected to include these factors in his report. Dr. Sarkar completed the proper analysis with the information he had, and the plaintiffs should not be punished for the defendants' lack of record keeping.

## B. *Summary Judgment Standard*

Summary judgment must be granted when the pleadings, depositions, answers to interrogatories, admissions, and affidavits show that there is no genuine issue as to any material fact, and that the moving party is entitled to summary judgment as a matter of law. Fed.R.Civ.P. 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Lang v. Retirement Living Pub. Co.*, 949 F.2d 576, 580 (2d Cir.1991). The moving party carries the initial burden of demonstrating an absence of a genuine issue of material fact. Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir. 1990). Facts, inferences therefrom, and ambiguities must be viewed in a light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Project Release v. Prevost*, 722 F.2d 960, 968 (2d Cir.1983).

When the moving party has met the burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586, 106 S.Ct. 1348. At that point, the non-moving party "must set forth spe-

---

**2.** It is unfortunate that such close scrutiny of GE's discovery production has been required. It has been necessary for Magistrate Judge Smith to compel the defendants to produce documents throughout the discovery process.

As Judge Smith commented, it is hard to believe that GE does not keep permanent records of performance reviews, if for nothing more than to protect itself from a suit such as this.

cific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56; *Liberty Lobby, Inc.*, 477 U.S. at 250, 106 S.Ct. 2505; *Matsushita Elec. Indus. Co.*, 475 U.S. at 587, 106 S.Ct. 1348. To withstand a summary judgment motion, evidence must exist upon which a reasonable jury could return a verdict for the nonmovant. *Liberty Lobby, Inc.*, 477 U.S. at 248–49, 106 S.Ct. 2505; *Matsushita Elec. Indus. Co.*, 475 U.S. at 587, 106 S.Ct. 1348. Thus, summary judgment is proper where "little or no evidence may be found in support of the non-moving party's case." *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1223–24 (2d Cir.1994) (citations omitted).

### C. *Disparate Impact Claim*

▇▇▇ The Second Circuit clearly allows for disparate impact claims in ADEA cases. *See Maresco v. Evans Chemetics, Div. of W.R. Grace & Co.*, 964 F.2d 106, 115 (2d Cir.1992); *Geller v. Markham*, 635 F.2d 1027, 1030 (2d Cir.1980). A disparate impact claim "targets 'practices that are fair in form, but discriminatory in operation.'" *Smith v. Xerox Corp.*, 196 F.3d 358, 364 (2d Cir.1999) (quoting *Griggs v. Duke Power Co.*, 401 U.S. 424, 431, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971)). To sustain a disparate impact claim, a facially neutral employment practice must have an adverse affect on a member of a protected class. *See Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 994, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988). A plaintiff must identify a specific employment practice as discriminatory and cannot rely on the overall decision-making process. *See Xerox Corp.*, 196 F.3d at 367. "[T]he plaintiff's burden in establishing a prima facie case goes beyond the need to show that there are statistical disparities in the employer's work force. The plaintiff must begin by identifying the specific employment practice that is challenged." *Fort Worth Bank & Trust*, 487 U.S. at 994, 108 S.Ct. 2777. Next, plaintiff must present "statistical evidence 'of a kind and degree sufficient to show that the practice in question has

caused the exclusion ... because of their membership in a protected group.'" *Xerox Corp.*, 196 F.3d at 365 (quoting *Fort Worth Bank & Trust*, 487 U.S. at 994, 108 S.Ct. 2777). General statistics used to support a disparate impact claim must be connected to a specific policy or practice. *See Brown v. Coach Stores, Inc.*, 163 F.3d 706, 712 (2d Cir.1998). These statistics must raise an inference of discrimination. *See Xerox Corp.*, 196 F.3d at 365. A variance of two standard deviations from the expected result is sufficient to warrant an inference of discrimination. *See id.* at 366; *Ottaviani v. State Univ. of N.Y.*, 875 F.2d 365, 371–72 (2d Cir.1989). While this level of disparity is not automatically statistically significant, it may be enough to warrant an inference of discrimination. *See Ottaviani*, 875 F.2d at 373. "If an obtained result varies from the expected result by two standard deviations, there is only about a 5% probability the variance is due to chance." *Xerox Corp.*, 196 F.3d at 366; *see also Waisome v. Port Authority*, 948 F.2d 1370, 1376 (2d Cir.1991).

Plaintiffs must begin by identifying a facially neutral employment practice which had a disparate impact on members of a protected class. In their complaint, plaintiffs·make a vague reference to "employee retention and elimination procedures" which adversely affected workers over forty. (Compl. ¶ 48.) During discovery, plaintiffs identified the implementation of the *GEI & PS Human Resources Procedure, Subject Lay Off* as the specific employment practice which had a disparate impact on employees over the age of forty. This document guided management in the implementation of the lay-offs. Plaintiffs' expert, Dr. Sarkar, was aware of this procedure before he completed his report, and he interacted with plaintiffs' attorneys regarding its significance. (Ulterino Aff.Ex. A at 133.)

▇▇▇ The plaintiffs must next provide statistics which support an inference of discrimination. According to the plaintiffs'

statistics, employees over the age of forty were disproportionately represented in the group terminated during the RIF. However, the over-representation of older workers must be statistically significant to provide an inference of discrimination. Plaintiffs' statistics show the number of terminated employees over the age of forty varied by more than two standard deviations from the expected result. This variation is only 5% attributable to chance and sustains an inference of discrimination.

### D. *Disparate Treatment Claim*

Plaintiffs claim older employees were the victims of disparate treatment age discrimination during the RIF. "The ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination." *Reeves v. Sanderson Plumbing Prods., Inc.,* —— U.S. ——, ——, 120 S.Ct. 2097, 2111, 147 L.Ed.2d 105 (2000). To establish the prima facie case of disparate treatment one must "show that (1) he was within the protected age group, (2) he was qualified for the job, (3) he was discharged, and (4) the discharge occurred under circumstances giving rise to an inference of age discrimination." *Hollander v. American Cyanamid Co.,* 172 F.3d 192, 199 (2d Cir.1999); *see also McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). "The burden of proof that must be met to establish a prima facie case is minimal." *Hollander,* 172 F.3d at 199. The "similarity of jobs is a factor to be considered but not a complete surrogate for the question of whether the plaintiff's main case supports a reasonable inference of a discriminatory motive." *Burger v. New York Inst. of Tech.,* 94 F.3d 830, 834 (2d Cir.1996). In addition, a "disparate treatment plaintiff may introduce statistics as circumstantial evidence of discrimination." *Hollander,* 172 F.3d at 202. After the plaintiffs establish their prima facie case of discrimination, the defendants must provide a legitimate, nondiscriminatory reason for its action. *See McDonnell Douglas Corp.,* 411 U.S. at 802, 93 S.Ct. 1817. "This burden is one of production, not persuasion; it 'can involve no credibility assessment.'" *Reeves,* 120 S.Ct. at 2106 (quoting *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 509, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)). Finally, if the defendants satisfy their requirement, the burden shifts back to the plaintiffs to show that the defendants' legitimate reason for action was merely a pretext for discrimination. *See McDonnell Douglas Corp.,* 411 U.S. at 804, 93 S.Ct. 1817. The "prima facie case and sufficient evidence to reject the employer's explanation may permit a finding of liability." *Reeves,* 120 S.Ct. at 2109. A plaintiff does not have to introduce "additional, independent evidence of discrimination." *Id.* However, the final burden is on the plaintiffs to show the employer intentionally discriminated against them because of their age. *See id.* at 2108.

Clearly, the plaintiffs meet criteria one and three necessary to establish a prima facie case. All of the plaintiffs were over the age of forty, and it is undisputed they were laid off as part of the RIF. The second criteria is also met by the plaintiffs. The plaintiffs all held their positions for long periods of time before the RIF, and the defendants readily admit the terminations had nothing to do with the plaintiffs' performance. As for the fourth criteria, the plaintiffs provide evidence that they were terminated while many younger employees were retained. Although no one was hired to replace the plaintiffs after their termination, if the positions of the plaintiffs were similar to the retained employees, they should have been compared to their coworkers on an employment matrix. Plaintiffs claim they performed essentially the same functions as the retained employees and were equally qualified, but were labeled "unique" so they could be terminated. The record further shows that younger employees were more successful

at finding other jobs within GE. Finally, plaintiffs' statistical report provides circumstantial evidence which also supports their prima facie case.

■ In the second step of the disparate treatment claim, GEPS explained the layoffs were due to increased competition from outside sources and a need to cut costs to remain competitive. Increased competition and cost cutting needs are legitimate business reasons for laying off workers. Therefore, the defendants have satisfied their burden of coming forward with a legitimate, non-discriminatory reason for the terminations.

■ Finally, the plaintiffs have presented evidence on the issue of whether the defendants' reason was merely a pretext. Three of the plaintiffs argue that the labeling of their functions as "unique" was done so they would not have to be evaluated against their coworkers. It should be determined at trial if the positions held by three of the plaintiffs were truly "unique," and thus not meriting comparison on a matrix. If their positions were not "unique," their labeling may be a pretext for discrimination. In addition, a number of younger employees that were terminated were able to find positions within GE's workforce, while all the plaintiffs were told there were no jobs that fit their skills. If the skills of these employees overlap, it could show the RIF's legitimate reason was merely a pretext for discrimination.

### E. *Practice and Pattern Claim*

If discrimination is part of a company's standard operating procedures, a plaintiff can base a claim on a "practice and pattern" of discrimination. *See International Bhd. of Teamsters v. United States,* 431 U.S. 324, 336, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). In the present case, each plaintiff claims that he may assert a claim of "practice and pattern" discrimination based on his co-plaintiffs claims. If this argument were to succeed, summary judgment would be rendered useless in multi-plaintiff ADEA cases. A plaintiff could simply base his claim on the unsupported allegation of another plaintiff in order to sustain a meritless action. Plaintiffs, some of whom were managers at GEPS, have provided no evidence that they were either discriminated against prior to their terminations or ever asked to discriminate against others based on age. In fact, plaintiffs admit that, while they were managers, they were instructed not to take age into account in employment decisions. Plaintiffs have offered no evidence of a "pattern and practice" of discrimination at GEPS.

### F. *Willful Violation of ADEA*

A willful violation of the ADEA occurs when an "employer knew or showed reckless disregard for the matter of whether its conduct was prohibited by the ADEA." *McGinty v. State of New York,* 193 F.3d 64, 69 (2d Cir.1999) (quoting *Hazen Paper Co. v. Biggins,* 507 U.S. 604, 614, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993)). GEPS clearly knew that it could not take an employee's age into account in determining who should be terminated. However, there is a question of fact as to whether the plaintiffs were intentionally laid off in the RIF because of their age.

### G. *Human Rights Law Claim*

■ Defendants contend that Pressman and Hollenberg are not individually liable under the HRL. The HRL states, "[i]t shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article." § 296(6). "A defendant who actually participates in the conduct giving rise to a discrimination claim may be held personally liable under the HRL." *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1317 (2d Cir.1995). The record shows that Pressman signed the layoff approval form for all the plaintiffs in this action. (Pressman Aff. ¶ 9.) Hollenberg, in his position as General Manager of the Global Sales Integration and Support unit, was required to review the termination deci-

sions for Hogan and Rees. Hollenberg also attended the meeting where it was decided Laporta would be removed from the matrix and labeled "unique." While it is clear Pressman and Hollenberg supervised and reviewed the terminations in the RIF, there is a question of fact as to how much they actually participated in the selection of employees for termination. Therefore, the action should continue against Pressman and Hollenberg.

## IV. CONCLUSION

Due to special circumstances surrounding the information used by plaintiffs' expert, the statistical report should not be excluded. This report, as well as other evidence provided by plaintiffs, supports the ADEA claims of disparate impact and disparate treatment discrimination. In addition, the plaintiffs have provided evidence that Pressman and Hollenberg participated in the RIF, and therefore the state HRL claim against them should not be dismissed. For the foregoing reasons, it is

ORDERED, that

1. Defendants' motion in limine to exclude the plaintiffs' expert statistical report is DENIED;

2. Defendants' motion for summary judgment on plaintiffs' ADEA claims based on disparate impact, disparate treatment, and willful violation are DENIED;

3. Defendants' motion for summary judgement on plaintiffs' HRL claim is DENIED; and

4. Defendants' motion for summary judgment on plaintiffs' ADEA claim based on a "practice and pattern" of discrimination is GRANTED.

IT IS SO ORDERED.